UNITED STATES of America, Plaintiff,

v.

William BERGDOLL et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

John J. BURRELL et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

John J. BURRELL et al., Defendants.

Crim. A. Nos. 75–164—75–166.

United States District Court, D. Delaware.

March 23, 1976.

---

W. Laird Stabler, Jr., U. S. Atty., John H. McDonald, Asst. U. S. Atty., Wilmington, Del., for plaintiff.

Harold Schmittinger, and I. Barry Guerke, of Schmittinger & Rodriguez, Dover, Del., Martin G. Weinberg, of Oteri & Weinberg, Boston, Mass., for defendants Burrell, Rote, Moss, Crook, Haseltine, Wagoner, Freund, Topp, Smith, Lockhard, Donahue, Garner and Dombroski.

Carl Schnee, and David E. Brand, of Schnee & Castle, Wilmington, Del., James R. Yon, Tampa, Fla., for defendants Bergdoll, Cartledge, Fleet, Peterson, Byerly, John Gilkes, Thomas Gilkes, Healy and Osgood.

Horace A. Knowlton, III, Tampa, Fla., for defendant Peterson.

Michael L. Pritzker, and David Schneider, of Pritzker & Glass, Chicago, Ill., for defendants Joseph Tevebaugh, Patrick Tevebaugh, Tilton and Maxwell.

## OPINION

STAPLETON, District Judge:

During the morning of Tuesday, July 1, 1975, federal and state law enforcement agents stopped and searched 13 vehicles in the Dover, Delaware, area and one vessel in the Delaware Bay. Thirteen tons of marijuana were seized and thirty-one individuals were arrested. Twenty-four of these individuals are defendants in three criminal actions currently pending before this Court which have been consolidated for pre-trial purposes. All of these defendants filed motions to suppress evidence and an evidentiary hearing was conducted thereon from January 27 to February 5, 1976. This Opinion records the Court's findings of fact and conclusions of law with respect to these motions.

## I. COMMON BACKGROUND AND PROBABLE CAUSE.

On June 10, 1975, Agent Barr of the Florida Department of Criminal Law Enforcement ("F.D.C.L.E.") received a tip from a confidential informant that Bradford Peterson would receive a large quantity of marijuana. (A–27, 73). It was thought that he would probably pick it up at a farm in North Central Florida. (B–40, 63–65). The informant did not know when. (A–81). Agent Barr confirmed that Mr. Peterson was then under indictment for possession of marijuana. (A–78). As a result of this tip the F.D.C.L.E. commenced a visual surveillance of Peterson on June 13 or 14. (A–139). This surveillance continued around the clock until June 30th. (A–32). Early in the course of this surveillance, the agents came to know of William Bergdoll by virtue of the fact that he resided with Peterson and worked with him in a joint business venture. (A–144).

On June 17th at approximately 2:00 A.M., an electronic beeper was attached to the undercarriage of Peterson's 1975 red International pickup truck with a camper top (Fla. # 3GK45505) while it was parked on a public road in front of his residence. (A–28–29). This battery powered device transmitted a signal which assisted the surveillance units in keeping track of the location of the vehicle between June 17th and June 21st when it was removed from the vehicle in the early morning at the same location. (A–30–31).[1]

Between June 17 and June 21st, Peterson traveled to North Central Florida and returned. Nothing suspicious was observed. After removal of the beeper on June 21st, Peterson made another uneventful trip to North Central Florida. In the course of this trip, the agents observed a blue (or turquoise) GMC pickup truck with white camper body (Fla. # 14GK10269) return to

---

1. The receiving device receives the signal transmitted by the beeper through two antenna which measure the strength and direction of the transmission and is able thereby to ascertain the approximate location of the beeper. (B–5).

Tampa with the Peterson vehicle. (B–62, 65, 99).

During the period from June 17th to June 21st the sole assistance received by the agents from use of the beeper was help in maintaining their surveillance during that period. This segment of the surveillance turned up no significant new information. (A–30–31, 35–36, 66; B–7, 60–61, 80, 99).

Late on Friday evening, June 27th, Barr's informant reported that the large quantity of marijuana was going to be brought into the "Eastern Seaboard region of the United States." (A–32). As a result of this information, the United States Drug Enforcement Agency ("D.E.A.") office in Tampa was contacted and D.E.A. agents joined the surveillance. (A–33–34).

While Agent Barr testified that he believed his confidential informant, except to the extent that subsequent surveillance observations be taken as corroboration of his tips, there is no evidence in the record of this case which vouches for the reliability of the informant or for his capacity to secure accurate knowledge about the subject matter of his tips.[2] The Court, accordingly, has treated the informer's tips in the same manner it would have treated a tip from an anonymous source.

Peterson and Bergdoll departed from Tampa in the International and GMC pickup-campers at approximately 7:00 A.M. on June 28, 1975. (A–142). They stopped briefly during the morning in Gainesville, Florida, and at about this time information was received from the informant that the load was now supposed to come in off the coast of Virginia. (B–67–69).

Under constant surveillance by ground and air units, Peterson and Bergdoll proceeded to Santee, South Carolina where they spent the night in a motel. On June 29th, they continued northward to Richmond, Virginia, where they stopped again for the night. The next morning they drove on to the outskirts of Dover, Delaware, where they checked into the Caravan Motel on Route 13 at about 3:00 P.M. (A–34–35, 91).

During the remainder of the afternoon and early morning, arrangements were made for surveillance of the Caravan Motel and three other motels located a short distance away on Route 13, The Sheraton Inn, The Holiday Inn, and The Ramada Inn. The agents who had conducted the surveillance from Florida were joined by additional D.E.A. agents and members of other federal and state law enforcement agencies. In addition to the stake outs at the motels, arrangements were made for mobile surveillance through the night by ground units and two aircraft. Through radio transmission on the D.E.A. frequency all units were in constant communication with one another and with a command post. After 7:30 P.M. the operation was directed primarily by D.E.A. Special Agent Lowell Miller. (E. g., B–41, 54; D–140–143).

At about 8:00 P.M., Peterson left the Caravan in his International pickup-camper and went to the Sheraton where he parked his vehicle. He then got into a blue Chrysler with Florida license tag 3W100346 and went back to the Caravan where he and several others got out and entered a motel room. (D–145). Approximately two hours later the other camper which had been followed from Florida left the Caravan, went to the Sheraton, and returned to the Caravan at 11:00 P.M. (D–138).

At 1:30 A.M., a brown Chevrolet pickup-camper with Tennessee license tag JK3840 was observed leaving the Holiday Inn. It was followed north on U.S. Route 13 for two miles where surveillance was terminated. (D–147).

At 2:00 A.M. a cream colored International pickup-camper and a brown and white Chevrolet van or "mini-motor home" were observed proceeding north on Route 13 and

---

**2.** The government did not elicit on direct any information regarding the informant's reliability or source of knowledge. While some information in this area was elicited on cross-examination, all portions of the cross relating to "the reliability-credibility and circumstances surrounding the informant's information" was stricken by stipulation of counsel for reasons which need not be elaborated here. (FA–184).

Agent Miller directed that they be surveilled by an air unit. (D–147–148). While it was dark at this time, the air units were able to identify this and other suspect vehicles for surveillance as a result of advice from ground units that the suspect vehicle was then passing a particular lighted sign or landmark or that it was two cars ahead of the ground unit, which then blinked its lights. (A–166; B–156–157). After making such an identification the air units were able to maintain visual contact with the head and tail lights of the suspect vehicle. (A–171, 195–96).

The assigned air unit followed the vehicles north on Route 13 and then east towards the Delaware Bay on State Route 42. Ultimately they turned onto a three mile segment of Delaware Route 6 which proceeds across marshland and terminates at a small community on the Bay called Woodland Beach. (GX–3; D–148). Just before reaching the Woodland Beach community the vehicles slowed and turned off the road to the left into an unlighted area. This area was known to one of the Delaware State police officers participating in the aerial surveillance to be the site of a small shanty used by the Fish and Game Authorities to weigh deer and a boat dock used to load and unload state boats and recreational craft. While not directly on the Bay, the dock is accessible to small boats from the Bay via a canal. (A–168; B–152, 174, 200).

It was not difficult for the air units to maintain visual contact. The night was clear. (A–203–204). The area within a ten mile radius of Woodland Beach is sparsely populated (C–7; GX–3) and there was "virtually no traffic" on the roads east of Route 13. (A–167, B–155). Agent Stevenson, who had previously participated in hundreds of air surveillance operations, testified that this was "one of the easiest surveillances" he had ever undertaken. (A–168). The air units were not able to see what activity was going on at the site, however, other than the flashing of braking lights which suggested that the car involved was maneuvering back and forth. (A–171).

At 2:30 A.M. an air unit reported that a vehicle was leaving the site to which the air unit had been led. (D–149). It followed this vehicle until it arrived at the Sheraton Motel and was picked up by a ground unit. (D–149). This small white camper with Illinois license plates 394062B, proceeded past the Sheraton and parked in the Holiday Inn parking lot.

At 3:05 A.M. an air unit reported a vehicle leaving the canal site and followed it back to the Sheraton where it was observed to be the same cream colored International pickup-camper (Ill. # 510653B) which had been observed going out earlier at 2:00 A.M. (D–150).

At 3:25 A.M. another vehicle departed the canal site. It was followed back to the Holiday Inn and was determined to be the same brown Chevrolet camper (Tenn. # JK3840) which had been observed headed north on Route 13 from Dover at 1:30 A.M. (D–155).

At 3:30 A.M. a bronze Monte Carlo (Pa. # 489–11C) and a yellow Cougar (Pa. # X23–772) pulling a U–Haul trailer (New Mex. # TC–4670) left the Sheraton parking lot. These vehicles were followed by air to the canal site. (D–153).

At 3:50 A.M. the GMC camper (Fla. # 14GK10269), which Bergdoll had driven from Florida, and a brown Ford camper (Tenn. # JL8547) were spotted at the Sheraton headed north on Route 13. Aerial surveillance was maintained and both proceeded to the canal site. (D–154).

At 4:00 A.M. a maroon GMC pickup-camper (Tenn. # J64516) left the Sheraton and proceeded to the canal site. (D–155–56).

Between 4:00 and 4:30 A.M. six vehicles were observed leaving the canal site. (D–156). All were surveilled back to various motels. In the order of their departure from the site they were the brown and white Chevrolet van or mini-motor home (N.Y. # 236ASL), the Cougar with the New Mexico trailer, Bergdoll's camper, the U–Haul truck (Tex. # EW2791), a brown Ford (Tenn. # JL8547), and the maroon

GMC pickup-camper (Tenn. # JG4516). (D–156–160). The last arrived back at 5:06 A.M. (D–159).

In summary, it is clear to me that, between 2:00 A.M. and 5:06 A.M., the ground and air units followed six vehicles to and from the canal site, one additional vehicle out to the site, and three additional vehicles back from the site. While the defendants challenge the reliability of the surveillance procedure used, I am persuaded to the contrary. Defendants' extensive cross-examination uncovered only one chink in the government's armor. One of the officers observing from the helicopter testified with respect to the surveillance back from the canal site that "with the exception of may be one or two, they were initially picked up as they came out of the . . . loading area . . . just off Route 6. . . . They were picked up when their headlights came on." (FA–4). He conceded that the one or two may have already been on Route 6 proceeding west when surveillance commenced. Given this testimony, it is, of course, conceivable that one of the three vehicles which was purportedly surveilled only on the way *from* the canal site had been in the Woodland Beach area for some purpose having no connection with that site. Given the record evidence concerning the sparsity of traffic, the pattern of such traffic as there was, the hour, and the character of the area through which Route 6 passes, I conclude that the officer was justified in concluding there was probable cause to believe all ten vehicles had been at the canal site.

Several other observations made in the early morning hours of July 1, 1975 are necessary to portray the full picture as it unfolded on that evening. On two occasions when the air units saw vehicles headed towards the canal site, they observed a car parked in a field beside the road turn on its lights as the eastbound vehicle passed, pull out and travel west as far as Route 13, turn around, travel back eastward, and resume its place in the field. (C–10–11).

At approximately 4:30 A.M. the helicopter, with the aid of a starlight scope, spotted a vessel approximately a quarter of a mile off shore at Woodland Beach. It was stationary and unlit. (B–158–60). Shortly thereafter, the same unit observed a vehicle pull up to the beach in the Woodland Beach area, flash its headlights out over the water, turn around, and proceed westbound on Route 6. (B–168–69).

"First light" on July 1st came at about 5:00 A.M. Shortly thereafter, but before official sunrise, the fixed wing aerial surveillance unit spotted a vessel approximately one mile off Woodland Beach underway at about 12 knots and headed in a northeasterly direction without running lights. It was a white, sixty-five foot trawler with a full cover over the aft portion of the deck. (A–171–74).

At 6:00 A.M., a Travel-All with Florida plates arrived at the Sheraton pulling a trailer with four skiffs. After detaching and leaving the trailer on the parking lot it departed. (B–24; D–161–62). Five minutes later, a brown and white Blazer (Va. # HMD273) arrived at the Sheraton (D–162), and parked next to the Monte Carlo which had been at the canal site. The operator of the Blazer, subsequently identified as defendant Burrell, got out and met the driver of the Monte Carlo on the sidewalk by the vehicles. (B–18–22). Agent Barr, at the time, recognized the second man as Gerald Rote. Agent Barr had previously investigated Rote for smuggling large quantities of marijuana into Florida and the Eastern Seaboard and had observed him plead guilty to state smuggling charges the previous week. (A–39–41, 104–107; E–63). Mr. Rote's presence was immediately communicated to Agent Miller. (D–166).

At 6:10 A.M. the yellow Cougar left the Sheraton parking lot and proceeded north on Route 13. Agent Miller gave orders that it should be followed for ten to fifteen miles and stopped. (D–166–67). It was stopped at 6:25 A.M. and a large quantity of marijuana was found in the trailer it was pulling. (D–167). There appears to be some confusion as to whether this vehicle was the first or second one stopped. The record reflects that both the Cougar and a

Ford U–Haul truck were stopped at approximately the same time. (F–4). The agent stopping the Cougar testified that he had heard one stop over the radio before he made his stop, which would be consistent with the Ford U–Haul's having been stopped first. In any case, large quantities of marijuana were found in both vehicles (D–167; F–5), and it is clear that all stops after these first two were made with knowledge that substantial quantities of marijuana had, in fact, been detected.

Agent Barr of the F.D.C.L.E. and Agent Miller of the D.E.A. testified, based on years of experience in the investigation of drug smuggling, that campers and U–Hauls were the most frequently used vehicles in marijuana importation and transportation and that all of the observations of June 30th and July 1, 1975 were consistent with their prior observations of marijuana smuggling operations. They were convinced by the events observed and reported to them that they were witnessing such an operation. (A–152–53; D–162–67).

■ While each individual observation may be susceptible of an innocent explanation, viewing all of the evidence gained from the surveillance between June 28th and July 1st as a whole, I conclude that the officers had probable cause at 6:10 A.M. to believe that they were observing a conspiracy to smuggle an illegal substance. Given the presence of a substantial number of out of state, load-bearing vehicles in a concentrated area, the location and character of the canal site, the timing and pattern of the traffic to and from that site, the vessel off shore, the presence of skiffs, the observation of furtive activity at the beach and along the roads leading to the Woodland Beach area, and the presence of Rote at the Sheraton shortly after his car had been to

the canal site, defendants' suggestion that the officers' observations were equally consistent with a beach party or other recreational activity is simply far fetched. Moreover, given the substantial load carrying capacity of the vehicles and the vessel, Rote's background, the confidential informant's "tip", and the consistency of the observations with the officers' past experience in marijuana smuggling situations, the officers were justified in believing that marijuana importation and distribution was the objective of the conspiracy.[3] The remaining probable cause issues in this case are thus not whether there was probable cause to believe an illegal conspiracy was in progress but whether there was probable cause to believe that the various vehicles stopped and the various individuals arrested were involved in that conspiracy.

## II. THE VEHICLE STOPS AND PROBABLE CAUSE.

1. *The Vehicles That Had Been At The Canal Site And The Defendants Who Occupied Them At The Time Of The Stops.*

■ Between 6:10 A.M. and 10:45 A.M. eight of the ten vehicles which had been at the canal site between 2:00 A.M. and 5:00 A.M. left the motel parking lots and were stopped after proceeding a short distance.[4] The vehicles were under surveillance between 5:00 A.M. and the time of their departure and, with one minor exception,[5] there was no cargo removed from any of these vehicles. One other vehicle which had gone to the site [6] remained in the Holiday Inn Parking lot until shortly after noon when it was inspected. A quantity of what appeared to be marijuana was observed on the tailgate. The rear door of the camper was ajar leaving the interior open to view

---

**3.** While on this record the informant's information must be considered the equivalent of an anonymous tip, the agents were justified in giving it credence after the surveillance had produced overwhelming corroboration for it.

**4.** The yellow Cougar (Pa. # X23–512) with trailer, the GMC pickup-camper (Fla. # 14GK10269), the cream International Harvester pickup-camper (Ill. # 510653B), the

Chevrolet pickup-camper (Tenn. # JK3840), the Ford U–Haul truck (Tex. EW–2791), the International pickup-camper (Ill. 394062B), the Chevrolet motor home (N.Y. # 236ASL), and the Monte Carlo (Pa. # 489–11C).

**5.** B–120–22.

**6.** The GMC pickup-camper (Tenn. # JG4516).

from the outside. Burlap bails similar to ones seized earlier that morning in other vehicles were observed inside and the vehicle was seized.

On these facts, I conclude that the agents had probable cause to believe that each of these vehicles contained marijuana at the time it was stopped and/or seized.

■ The record affirmatively establishes that at the time of the stops, six of the defendants, Freund, Haseltine, Moss, Donahue, Peterson and Rote were driving vehicles which had been at the canal site.[7] Common sense would indicate that a person having custody of a car so recently at the site and in all likelihood carrying marijuana obtained there would be involved in the conspiracy. A contrary conclusion could only be predicated on the unlikely assumption that the conspirators, having successfully landed contraband of very substantial value, had entrusted the fruits of their efforts to innocent third parties. Accordingly, I conclude that the officers had probable cause to believe these individuals were involved in the perpetration of a felony.

■ Seven other defendants were arrested in the course of these stops. Defendants Wagoner, Crook and Cartledge were clearly passengers. However, in each of these three instances marijuana of substantial bulk was found in the course of the stop, marijuana sweepings or burlap bails were visible from outside the vehicle, and the odor of marijuana was clearly evident outside the vehicle. (F–4; E–86, 103–105,

107; F–33–34).[8] Two other defendants Patrick and Joseph Tevebaugh, were by themselves in one of the stopped vehicles, but there is no record evidence as to who was driving. Here also, however, a strong odor of marijuana emanated from the vehicle. (B–33). Given this set of facts with respect to those five individuals, it was certainly reasonable to believe that each was aware of the presence of marijuana. While knowing presence in a vehicle transporting recently imported marijuana away from the locale of its importation may not alone establish participation in the conspiracy beyond a reasonable doubt, I conclude that it is sufficient in these circumstances to constitute probable cause for an arrest. *United States v. Heiden,* 508 F.2d 898 (9th Cir. 1974). See also *United States v. Oswald,* 441 F.2d 44 (9th Cir. 1971).

■ The remaining two occupants of the vehicles that had been to the canal site, defendants Tilton and Maxwell, present a slightly different situation. The record neither indicates who was driving nor evidences any sign of marijuana observable from the exterior of their pickup-camper. Given its presence at the canal site, however, there was probable cause to believe their pickup-camper contained marijuana and the bulk of the marijuana in fact found (i. e., 1,860 lbs.) was such as to permit a reasonable inference of knowledge of its presence on the part of the two occupants of the vehicle as it left the Dover area at 10:20 A.M. (E–10). Accordingly, I reach

---

7. In addition, as to Rote, the agents were reasonable in believing that Rote was seeking to avoid arrest when he pulled into a residential subdivision shortly before his vehicle was stopped.

8. I agree with the defendants that the occupants of the vehicles were restrained of their liberty early in the stop when they were ordered out of their vehicles at gun point. This does not, however, make the officers' observations after that point irrelevant for present purposes. Even if the officers did not have probable cause with respect to a particular individual at the instant of the stop, if the stop and search of the vehicle was legal (see Section IV, *infra*), and if they found probable cause to arrest that individual during the course of the stop, any

subsequent in-custody search of their persons thereafter would not be the fruit of an illegal arrest. An illegal arrest does not make one immune from subsequent arrest based on information lawfully secured. Moreover, I think it clear that officers executing a legal stop and search of a vehicle have a right to restrain the occupants when reasonably necessary to avoid retaliation for the stop and interference with the search. Finally, even if this were not the law, I conclude, as hereafter indicated with respect to defendants Tilton and Maxwell, that where officers have probable cause to believe a vehicle involved in a conspiracy contains marijuana of substantial bulk, they have probable cause to believe that all occupants of the vehicle are knowing participants.

the same conclusion with respect to Tilton and Maxwell as with respect to Wagoner, Crook, Cartledge and the Tevebaughs.

### 2. The International Pickup-Camper (Fla. # 3GK45505) And Defendant Bergdoll.

There was no marijuana seized from the International pickup-camper which had been followed up from Florida. The sole question, accordingly, relates to the validity of the arrest of defendant Bergdoll, its driver and sole occupant on the morning of July 1st, and of a search of his person made incident to that arrest. This vehicle did not go to the canal site. The GMC camper which Bergdoll drove from Florida, however, did go to that site and the observations thus suggested that either he or his roommate and business partner, Peterson had visited this distribution point. In addition, Bergdoll had come all the way up from Tampa with Peterson and had left the motel in Peterson's camper at the same time Peterson left in one of the suspect vehicles. All of the facts taken together made it more reasonable to infer that Bergdoll was involved in the conspiracy with Peterson than to infer that he had come all the way up from Tampa for the ride and no other apparent purpose.

### 3. The Ford Elite (Va. # RCA–180) And Defendant Fleet.

The record discloses relatively little about defendant Fleet. She arrived in Dover in her Ford Elite (Pa. # RCA–180) and was subsequently seen in the company of Peterson and Bergdoll. Her car was not a load bearing vehicle and did not go to the canal site. On the morning of July 1st, her car preceded the Peterson and Bergdoll vehicles as they departed from the Caravan. While there may have been some reason to suspect her of involvement in the conspiracy, the information which the agents had did not amount to probable cause. Her motion to suppress will be granted.

### 4. The Blue Chrysler (Fla. # 3W100346) And Defendants Dombroski and Garner.

Defendants Dombroski and Garner, along with four others who are not now defendants, were arrested for conspiracy during the stop of the blue Chrysler at 8:45 A.M. Their fingerprints were taken after their arrest and later proved to match prints taken from the maroon GMC pickup-camper which remained in the Holiday Inn parking lot and was found to contain a large quantity of marijuana.

Prior to 8:45 A.M. neither Dombroski nor Garner had been observed doing anything. The sole basis for the stop of the blue Chrysler and their arrest was that this car had been seen giving Peterson a ride from the Sheraton to the Caravan at about 9:00 P.M. the previous evening and had also been observed north of Dover traveling south on Route 13 at about 4:30 A.M.[9] Here also, the agents were entitled to their suspicions but were not entitled to arrest these defendants. Their motion will be granted.

### 5. The Blazer (Va. # HMD–273) And Defendant Burrell.

As in the case of the Ford Elite and defendant Fleet, the government's only support for the stop of the Blazer and the arrest of defendant Burrell is a brief contact between Burrell and one of the drivers of a canal site vehicle. The only record evidence tending to connect Burrell with the conspiracy is testimony that he arrived at the Sheraton at 6:00 A.M. and conversed briefly with defendant Rote. This association did not justify the arrest of Burrell and the search of his vehicle.

### III. PROBABLE CAUSE FOR THE ARRESTS OF DEFENDANTS TOPP, SMITH, AND LOCKHARD IN ROOMS 221 AND 222 OF THE HOLIDAY INN AND THE SEARCH OF THOSE ROOMS.

At approximately 11:15 on the morning of July 1, 1975 several officers went to

---

**9.** I find nothing suspicious about the activity of this car at this later sighting.

Rooms 221 and 222 of the Holiday Inn and, without warrants, arrested the occupants, defendants Topp, Smith and Lockhard, for possession of a small quantity of marijuana which was found in the toilet bowls of these adjoining rooms. The officers had gone up to the rooms because of information provided them by the motel manager and desk clerk. (F–72, 84). That information consisted of (1) the manager's conclusion that the three occupants of the room had been associating with people who the manager assumed had been among those arrested earlier that morning, (2) the fact that the vehicle which the occupants had listed on their registration form, but which the officers had been told did not belong to the occupants (FA–89, 101), was one of the vehicles that had been searched earlier and found to contain a large quantity of marijuana,[10] and (3) the fact that one of the occupants had been trying to arrange for rental of a U–Haul van. (F–22).[11]

Based on these facts alone the officers could not have had probable cause to arrest the occupants of Rooms 221 and 222 for possession of marijuana. At the suppression hearing Agent Ashton conceded as much (F–105), testifying that the officers went up to Rooms 221 and 222 to interview

the occupants rather than to arrest them. (F–73, 96, 105).

The agents contended, however, that once at the rooms they developed facts which gave them probable cause to enter, arrest the occupants, and search the premises.[12] I do not agree.

The agents testified that virtually simultaneously (1) defendant Topp opened the door to several officers at least one of whom had his gun drawn, (2) Agent Ashton identified himself to Topp as a D.E.A. agent and saw a heel of someone inside the room as that person went into a bathroom, (3) the officers heard movement inside the room and the sound of a toilet flushing, and (4) the agents rushed into the bathrooms and retrieved a small quantity of marijuana from the toilet bowls.

The observation of a heel of someone's shoe as that person goes into a bathroom and the sound of movement and a flushing toilet, in and of themselves, could not form the basis of a probable cause belief that the occupants of the room were attempting to dispose of marijuana. If the record indicated that the occupants' apparent conduct was in reaction to the officers' identities as narcotics agents then inferences of guilty

10. The officers did not contend at the suppression hearing that the occupants of the motel room were arrested for a crime growing out of their connection with this quantity of marijuana, but rather for possession of the small quantity of marijuana found in the toilet bowls in the two motel rooms. (F–103–05). And, indeed, the minimal and conflicting information known to the officers about the connection between these individuals and the Haseltine and Wagoner vehicle would not have constituted probable cause to arrest them.

11. The government also claims that the officers were shown a discrepancy between the name signed on the motel registration form at two different places, suggesting apparently that the officers may have suspected the registrant of using a false name. I can find no grounds for such a suspicion based on what the officers testified they observed on the registration card, and, indeed, one of the officers testified that they assumed at the time they saw the registration and went up to the rooms that the registrant had signed his correct name. (A–177).

12. The government does not contend and, indeed, on the facts of this case could not contend, that the agents entered the rooms upon the consent of defendant Topp. The agents knocked on the door with at least one of their guns drawn, (F–101–02), Agent Ashton identified himself as a D.E.A. agent and at virtually the same moment pushed Topp aside and, along with other agents, ran to the bathrooms. Defendant Topp's stepping back from the opened door when he saw the armed agents is as consistent with a retreat from a show of force as it is with any sort of voluntary consent. The agents' actions constituted precisely the kind of overt acts and threats of force which the Supreme Court has held vitiate any "consent" to search which may have been given. *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598, 44 U.S.L.W. 4112 (1976); *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

knowledge and illegal activity on the part of the occupants might possibly be drawn. See *Wong Sun v. United States,* 371 U.S. 471 at 482–83, 83 S.Ct. 407 at 414–15, 9 L.Ed.2d 441 at 451–52 (1963). But the evidence in this case indicates that such limited activity as the officers' ·observed occurred simultaneously with Agent Ashton's announcing his identity and I am not persuaded that the officers reasonably inferred that this activity was in response to their presence. Rather, I believe the officers' abrupt intrusion on these premises was the product not of a rational inference based upon observations after the opening of the door, but rather of a suspicion that the occupants of the rooms were somehow connected with the smuggling operation and that some of the fruits of that operation were on the premises.[13] Since the record does not provide support for more than a suspicion on this score, I can neither sanction the officers' action in entering nor sustain their arrests based on what they found inside. The marijuana seized from Rooms 221 and 222 will be suppressed.

**13.** The true picture of what occurred is reflected best, I believe, in the following candid testimony of Agent Stevenson:

Q And what if anything did the agents say when he opened the door?

A Well, they identified themselves as police officers and then tried to secure the room, to secure the occupants of the room. As I entered the room I heard the toilet flushing, and one of the occupants was in the bathroom. South and I went into the bathroom and found that he was trying to flush a quantity of marijuana or what appeared to be marijuana down the toilet.

\* \* \* \* \* \*

Q What was your purpose in going to Rooms 221 and 222 of the Holiday Inn at that point?

A At that point it was to—the people had been remaining in the area. The plan of action had been to maintain surveillance on all vehicles until they started to leave town, and arrest them as they left town. After they returned from the Woodland Beach area they all returned to the motels and stayed there until sometime after the traffic picked up, so that they wouldn't—evidently so they wouldn't be too obvious on the road.

And as all of the rest of the vehicles had left their motels, the people had been arrest-

## IV. PROBABLE CAUSE FOR THE SEARCH OF THE "MISS AYLOR" AND THE ARREST OF THE DEFENDANTS BYERLY, THOMAS GILKES, JOHN GILKES, HEALY AND OSGOOD.

■ At about 6:30 A.M. one of the air units made a sweep over the trawler which had been observed at anchor one quarter of a mile off Woodland Beach at 4:30 A.M. and again underway shortly after first light. The units' observation revealed that the name of the vessel was the "Miss Aylor". (C–11–12). The two air units then kept it under surveillance until it was intercepted by a police boat at approximately 8:00 A.M. (A–173–5; F.A.–108.

The police boat dispatched to pursue the Miss Aylor was manned by four Delaware State police officers and Agent Mole of the U.S. Customs Service. The vessel was in touch with the ground and air surveillance units, via state police radio, (FA–9, 16–19). At approximately 8:00 A.M., Agent Mole instructed Officer Ramsey to hail the Miss Aylor on the loudspeaker and tell her to

ed. And this vehicle had not moved. These people had not moved. Exactly who had determined that they were involved directly, I understood they had been subjects of the surveillance during the night also.

\* \* \* \* \* \*

Q And there was a knock on the door; is that correct?

A That's correct.

Q Mr. Topp opened the door, from what you saw?

A That's correct.

Q The officers charged in; is that right?

A Well, we went in expeditiously. I wouldn't say charged.

Q There was no conversation prior to their entrance to the room, was there?

A They identified themselves, yes. They had badges on and the uniform officers were, of course in uniforms. We had our badges on and credentials out.

Q. And then entered the room?

A. And then entered the room.

Q Were guns out when this was done?

A Yes.

Q The purpose was to arrest these people; is that right?

A That's correct.

stand by for customs inspection of her papers and cargo. (FA–14, 108).

At approximately 8:05 A.M. Agent Mole boarded the Miss Aylor accompanied by an officer carrying a shotgun. (FA–109). As he was boarding Agent Mole detected the odor of marijuana. (FA–18). Moreover, just as he was leaving the police vessel one of the officers spotted two "packages" floating in the water just off the stern of the trawler. (FA–109–10). These were retrieved immediately after Mole boarded the Miss Aylor and were found to be a pillowcase and a garbage bag, containing marijuana. (FA–23, 109–10, 122). It was apparent that these had not been in the water long. (FA–122). Agent Mole was advised of this find. (FA–20–23).

The crew was instructed to remain in the stern and Mole and Ramsey went with Captain Thomas Gilkes to the cabin to inspect his papers. Thereafter Mole searched the two holds of the vessel. He found marijuana debris and "water hold washdown" which indicated to him that the deck had been scrubbed down. (FA–17–18). Mole then informed the Captain and crew that they were under arrest for smuggling marijuana. (FA–20). I can find no fault with the stop of the Miss Aylor or with the arrest of its captain and crew.

Congress has provided in Section 1581 of Title 19 as follows:

> Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters . . . and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof . . . and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

Section 7607 of Title 26 provides:

> Officers of the customs (as defined in section 401(1) of the Tariff Act of 1930, as amended; 19 U.S.C., sec. 1401(1), may—
>
> * * * * * *
>
> (2) make arrests without warrant for violations of any law of the United States relating to narcotic drugs (as defined in section 102(16) of the Controlled Substances Act) or marihuana (as defined in section 102(15) of the Controlled Substances Act) where the violation is committed in the presence of the person making the arrest or where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation.

The government contends that a customs agent in Agent Mole's position need not have probable cause to stop and search a vessel pursuant to 19 U.S.C. § 1581, and that only a "founded suspicion" is required to justify such activity.[14] In this case, however, I need not determine any close question regarding the appropriate accommodation between the interests served by that section and those served by the Fourth Amendment. When the Miss Aylor was boarded the law enforcement agents had probable cause to believe that they had observed a conspiracy to illegally import a large quantity of marijuana and that the Miss Aylor had played a significant role in that conspiracy. Prior to the search additional evidence of its involvement had been secured in the form of the odor of marijuana and the recently discarded packages. And given the size and character of the operation, any rational agent would have inferred at the time of the arrests that all of the crew, as well as the captain, had knowingly participated in the conspiracy.

## V. THE PRESENCE OF EXIGENT CIRCUMSTANCES JUSTIFYING THE WARRANTLESS SEARCHES.

With respect to the arrests of all defendants, who were occupants of vehicles, other than Dombroski, Garner, Fleet and

---

**14.** Citing *United States v. Clark,* 501 F.2d 492 (9th Cir. 1974); *United States v. Mora-Chavez,* 496 F.2d 1181 (9th Cir. 1974), *cert. denied,* 419 U.S. 878, 95 S.Ct. 141, 42 L.Ed.2d 118 (1974); *United States v. Prince,* 491 F.2d 655 (5th Cir. 1974); *United States v. Steinkoenig,* 487 F.2d 225 (5th Cir. 1973).

Bergdoll, and with respect to all stops other than those of the blue Chrysler, the Blazer, and the Ford Elite, the agents had probable cause to believe that the defendants were involved in a conspiracy to import and distribute marijuana and that the vehicles contained marijuana which the defendants were attempting to move out of the jurisdiction. Defendants, argue, however, that regardless of whether or not probable cause existed, the searches were illegal in that they were conducted without a warrant in situations where the law required the officers to obtain prior judicial approval. Defendants argue that by 5:06 A.M. on the morning of July 1, the surveilled vehicles had returned to their respective motel parking lots and their occupants had exited, that the surveilling officers obtained no further information after that time which they used as a basis for establishing probable cause to stop and search the vehicles, that at that time there were sufficient law enforcement personnel in the area to cover all exits from and entrances to the four parking lots, that facilities were available in close proximity to the motels where warrants could have been obtained, and that in such circumstances the police officers were required to obtain prior judicial approval before searching the suspect vehicles. I disagree.

■ To begin with, although the suspect vehicles had returned to the motel parking lots by 5:06 A.M., the officers conducting the surveillance had no grounds for concluding that the vehicular activity of the evening had terminated. Furthermore, up until the occupants re-entered their vehicles and proceeded to leave the area the officers did continue to compile valuable information concerning the character and scope of the conspiracy and the identity of the con-

spirators. The officers were entitled to delay obtaining a search warrant while they continued to build their case against the suspects. There is no requirement that police officers obtain a search warrant the moment they obtain information which might subsequently be held to constitute probable cause to conduct a search. *Cardwell v. Lewis,* 417 U.S. 583, 595–96, 94 S.Ct. 2464, 2471–72, 41 L.Ed.2d 325, 337–38 (1974).[15]

Once the vehicles began moving, the agents were forced to take swift action to prevent the vehicles, which they suspected of containing large quantities of marijuana, from leaving the area. The officers were faced with the urgent need to act which the Supreme Court has long recognized in the case of automobiles moving on the public highway:

> [T]he Fourth Amendment has been construed, practically since the beginning of the government, as recognizing a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

*Carroll v. United States,* 267 U.S. 132 at 153, 45 S.Ct. 280 at 285, 69 L.Ed. 543 at 551 (1925).

The court in *Carroll* recognized the dangers inherent in authorizing the warrantless stopping and searching of vehicles traveling on the public highway and held that such stops and searches were not to be sanctioned unless those authorized to make the stops had "probable cause for believing that

---

**15.** Even if the officers had determined to seek a search warrant at 5:06 A.M. when the vehicles had returned to the parking lots, I cannot conclude that they would have had sufficient time between then and 6:10 A.M., when the vehicles began leaving the area to obtain judicial approval. This would have required the officers to prepare some kind of organized written presentation of the observations of the numerous law enforcement agents conducting air and ground surveillance concerning the detailed movements of many suspect vehicles. And even after submission of such a presentation, it would have taken any conscientious magistrate a substantial period of time to evaluate the probable cause showing with respect to each vehicle. I am satisfied that all of this could not have been accomplished during the one hour the agents had before the urgency of the situation required their immediate action.

[the] vehicles are carrying contraband or illegal merchandise." 267 U.S. at 154, 45 S.Ct. at 285, 69 L.Ed. at 552. The exception to the warrant requirement which was here noted by the *Carroll* court fits precisely the situation which is now before me. Other than as noted in the preceding sections of this Opinion, the circumstances were exigent and the officers had the requisite probable cause. The stops and searches were valid.[16]

One further question in this area remains for decision. Defendants Haseltine and Wagoner also challenge the warrantless search at police headquarters of suitcases seized from the vehicle in which they had been arrested. They argue that once the suitcases had been seized and taken into police custody, no exigent circumstances existed which would justify the agents in opening and searching through the suitcases without first obtaining judicial approval. They thus seek to distinguish the invasion of their privacy effected by the seizure of these suitcases from that occasioned by the subsequent search of the suitcases' contents. Although such a distinction has some appeal, I am mindful that in *United States v. Valen,* 479 F.2d 467 (3rd Cir. 1973), our Court of Appeals upheld the warrantless search of suitcases which had been seized during the course of an inter-city shipment and which the police had probable cause to believe contained marijuana. In his concurring opinion Judge Adams stated:

> The Court here holds that under the "exigent circumstances" doctrine both the warrantless seizure of appellant's suitcase and the warrantless search of its contents squares with the requirements of the Fourth Amendment. My view, as applied to the present case, would be that while sufficient probable cause existed for the warrantless seizure of appellant's luggage, the subsequent warrantless search

of the suitcase's contents of Agent Clements violated the Fourth Amendment.

\*　　\*　　\*　　\*　　\*　　\*

It appears, however, that the Supreme Court, in *Chambers v. Maroney,* 399 U.S. 42, 51–52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), has rejected any such proffered distinction between warrantless searches and warrantless seizures. And, since Chambers is not, in my judgment, sufficiently distinguishable from the present case to permit either a different analysis or result here, I am impelled to concur in the result reached by the majority opinion.

479 F.2d at 472.[17]

I concur in the observations here expressed by Judge Adams and find their rationale equally apposite in the factual situation now before me. The motions to suppress the contents of these suitcases will be denied.

## VI. THE ELECTRONIC SURVEILLANCE IN FLORIDA.

Defendants also argue that the arrests and searches which occurred in the Dover area on July 1st were based on the fruits of an illegal electronic surveillance which took place in Florida over the four day period from June 17 through June 21. The allegedly illegal electronic surveillance was in the form of an electronic beeper which was attached to defendant Peterson's red and white International camper and which emitted electronic signals which would have permitted law enforcement agents to locate Peterson's car in the event they had lost visual contact with it during the course of their surveillance. Defendants contend that use of such electronic devices to surveil a suspect's activities is impermissible without obtaining prior court approval.

---

**16.** The same is true with respect to the stop and search of the Miss Aylor.

**17.** See also *United States v. Kulp,* 365 F.Supp. 747 (E.D.Pa.1973) *aff'd Appeal of Kulp,* 497 F.2d 921 and *Appeal of Powell,* 497 F.2d 922

(3rd Cir. 1974); *United States v. Soriano,* 497 F.2d 147 (5th Cir. 1974); *United States v. Anderson,* 500 F.2d 1311 (5th Cir. 1974), and Judge Aldisert's concurring opinion in *United States v. Vallejo,* 482 F.2d 616 (3rd Cir. 1973).

It is conceded that no search warrant was obtained by the government agents prior to their attaching the beeper device onto Peterson's vehicle. However, even assuming that the use of an electronic beeper constitutes a sufficient invasion of an individual's expectation of privacy to require court approval before such a device is used,[18] the record indicates that no information obtained from the beeper-assisted surveillance was used by the agents in their subsequent surveillance operations and that the surveillance itself was occasioned by an independent source. Simply stated, attachment of the electronic beeper device bore no fruits which subsequently contributed to the July 1st arrests and searches in the Dover area.

The record is clear that the agents knew about the association between defendants Peterson and Bergdoll independent of any contacts which may have been observed between these two individuals while the beeper was on Peterson's vehicle. Seven days prior to June 28th the beeper had been removed and the unassisted round the clock surveillance originally occasioned by the informant's tip had been reinstituted. It was as a result of this unassisted surveillance that the agents were in contact with Peterson and Bergdoll when they departed for Dover on that date. Whether the matter be analyzed as one of "attenuation", as the government suggests, or as one of "independent source", it is clear that there was no legally relevant connection between the electronic surveillance and the subsequent searches and arrest in Dover. See *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) and *Silverthorne Lumber Company v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).[19]

## VII. THE IDENTIFICATION TESTIMONY.

■ On July 1, 1975, D.E.A. Agents Michael Byrnes and John Smith interviewed clerks at several of the surrounding hotels in the Dover, Delaware, area, in an effort to gain some degree of understanding of the totality of the situation. At each interview, the hotel clerk was shown a stack of 31 color Polaroid pictures of the individuals who had been arrested the night before, and were allowed to freely flip through the stack without interference by the agents. They were asked only if they could recognize any of the individuals displayed in the pictures and if so, what was the basis for their recognition. Each individual was interviewed alone and outside the presence of other clerks who might be subsequently interviewed. On July 28, 1975, SAIC Glanz, D.E.A. interviewed the hotel clerks of the Caravan Motel and the Sheraton Motor Inn, using basically the same procedure as before by Agents Byrnes and Smith. This was the second interview of Leslie Eastwood of the Sheraton Motor Inn who had previously been interviewed on July 1. At this interview, Leslie Eastwood was shown a set of black and white photographs that had been taken during the processing of the defendants after their arrest. After the authorities had gained knowledge that some of the packaging used in the transporting of the marijuana had been purchased locally, the employees of several local furniture outlets were also interviewed but at this time were shown both the color and black and white spreads. However, at no time were the interviewees shown less than 31 photographs and they were always interviewed outside the presence of any other prospective witnesses.

Several defendants who anticipate that these witnesses may give identification testimony against them at trial contend that these photographic displays were unduly suggestive and that their testimony should be suppressed.

The United States Supreme Court in *Simmons v. United States,* 390 U.S. 377, 88

---

18. See *United States v. Holmes,* 521 F.2d 859 (5th Cir. 1975); *United States v. Martyniuk,* 395 F.Supp. 42 (D.Or.1975).

19. Further, I am unable to perceive how any of the defendants, other than Peterson, could conceivably have standing to rely upon the beeper as a source of taint.

S.Ct. 967, 19 L.Ed.2d 1247 (1968), has set forth the standards to be used in evaluating pretrial photographic identification. In *Simmons, supra,* the Supreme Court delineated some of the dangers inherent in the use of photographs as an investigative technique, but while recognizing some of the problems, refused to adopt any per se rule for exclusion purposes. Mr. Justice Harlan stated for the court that:

> We hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. 390 U.S. at 384, 88 S.Ct. at 971, 19 L.Ed.2d at 1253.

Despite the serious risk of misidentification through the use of photographs, the Supreme Court was "unwilling to prohibit [their] employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement", noting that the technique was "used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs". *Id.* at 384, 88 S.Ct. at 971, 19 L.Ed.2d at 1253.

Chief Judge Seitz recently summarized the law in this area as follows:

> . . . In *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the Supreme Court explicitly reaffirmed the proposition that the underlying rationale of decisions such as *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (photographic identifications), and *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) (one man showup), is that a defendant is denied due process when the identification procedure is so suggestive as to create "a very substantial likelihood of irrep-

arable misidentification." The question is whether "under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil,* [409 U.S.], at 199, 93 S.Ct. at 382. *Neil* identified five criteria to be weighed in determining the likelihood of misidentification: (1) the opportunity for the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*Government of the Virgin Islands v. Navarro,* 513 F.2d 11, 17 (3rd Cir. 1975).

Initially, I find nothing in the record before me which indicates that the photographic displays were suggestive. No less than 31 photographs were ever shown to any prospective witness and at no time did the agents draw attention to any particular photograph. The witnesses were simply handed a stack of photographs and asked whether they could identify any of the individuals. Nor can it be contended that the character of the photographs or the person depicted made any particular individual stand out as an obvious choice. Some of the witnesses were shown two sets of photographs, one set in color and one in black and white, but this is not a case where those suspected by the police were portrayed in color while others were portrayed in black and white or where some individuals appeared in both spreads while others did not. Agent Glanz testified that he had shown Leslie Eastwood the black and white spread after her exposure to the color spread only because they were closer and of better quality and there was no indication whether this would strengthen or weaken her earlier identification. See *United States v. Bowie,* 515 F.2d 3 (7th Cir. 1975).

But even if the procedures here used were found to be suggestive in some way, I would still conclude that the motion to suppress these witnesses' identification testi-

mony should be denied. Considering the five criteria suggested in *Neil,* I would conclude on the present record that, under the totality of the circumstances, the procedures used were not so suggestive as to create "a very substantial likelihood of irreparable misidentification". While the record does not in most instances indicate that a prior description was given by the witness, each had a good opportunity to view the subjects at the time of the original contact with him, each had occasion to focus attention on the subjects, and the showing of the photographic spread, in each instance, followed the witness' exposure to the subject identified by a relatively brief period of time. While the identification witnesses expressed varying degrees of certainty during cross-examination, nothing in that examination leads me to believe that permitting these witnesses to testify would create the kind of risk of misidentification which the Due Process Clause forbids.

### VIII. CONCLUSION.

The suppression motions of defendants Dombroski, Garner, Fleet, Burrell, Topp, Smith and Lockhard are granted. The remaining suppression motions are denied.[20]

---

**20.** I have considered defendants' argument that the government's delay in providing them with requested discovery calls for the suppression of certain evidence whose seizure was the subject of the requested discovery materials. I can find neither bad faith on the part of the government nor prejudice to the defendants as a result of the delayed disclosure. Consequently, defendants' motion to suppress on this basis is denied.