UNITED STATES of America, Plaintiff,

v.

Andrew K. MEARNS, III, Peter J. Thomas and John W. Hedley, Defendants.

Crim. A. No. 77–90.

United States District Court,
D. Delaware.

Jan. 5, 1978.

James W. Garvin, Jr., U. S. Atty., John H. McDonald, Asst. U. S. Atty., Wilmington, Del., for plaintiff.

Victor F. Battaglia and Fred S. Silverman, of Biggs & Battaglia, Wilmington, Del., for defendant Mearns.

John G. Mulford, of Theisen, Lank, Mulford & Goldberg, Wilmington, Del., for defendant Thomas.

David F. Brewster, of Taufen & Brewster, Wilmington, Del., for defendant Hedley.

## OPINION

STAPLETON, District Judge:

The defendants, Andrew K. Mearns, III, Peter John Thomas and John William Hedley, were indicted on two counts of distributing cocaine and one count of possession of cocaine with intent to distribute, under 21 U.S.C. § 841(a)(1), and one count of conspiracy to violate Section 841(a)(1), under 21 U.S.C. § 846. All three defendants plead not guilty to all counts on October 12, 1977. The defendants have now moved to suppress evidence which they claim to have been illegally obtained. In addition, Mearns has moved the Court to allow him to inspect the grand jury minutes and Thomas has moved for a separate trial. An evidentiary hearing was held concerning the suppression motions on November 18, 1977.

## THE FACTS

On the evening of September 25, 1977, Special Agent William Bouldin of the Drug Enforcement Administration ("DEA") received information from an allegedly reliable informant [1] that Hedley would be leaving his residence in the Paper Mill Apartments in Newark, Delaware, and driving to the Wilmington train station to pick someone up, and that he would be meeting with his source of supply for cocaine later that evening in the parking lot of the Greenville Shopping Center. Bouldin followed Hedley from his residence to the train station where Hedley picked up a passenger. Hedley was driving a 1971 red Peugot.[2] Hedley, with his passenger, proceeded to George's Next Door, a bar in Wilmington, where they remained for approximately an hour. No surveillance was conducted inside the bar. Hedley and his passenger then exited from the bar and drove off. Bouldin's surveillance was broken off at that point. Hedley was next observed by Bouldin ten minutes later at the Greenville Shopping Center, where he was alone in his car. At the Shopping Center, Hedley left his car and entered a 1968 Volkswagen minibus ("VW"),[3] where he remained for fifteen or twenty minutes. After he left the VW, Hedley and the VW both left the shopping center. Bouldin followed for two miles and then broke off surveillance.

At about 11:15 A.M. on September 26, 1977, Bouldin met with the informant who indicated that Hedley's cocaine source would be coming to the Paper Mill Apartment complex shortly. The VW was observed by Bouldin at the Paper Mill Apartments near Hedley's apartment at that time, and was occupied by two white males.

At about 1:30 that afternoon, Special Agent William Glanz of the DEA and Bouldin met with the informant who told them that a series of deliveries of cocaine from Hedley to Bouldin had been arranged, with an initial delivery of one ounce of cocaine. If the initial delivery was satisfactory to Bouldin, Hedley would make further deliveries. Glanz and Bouldin formulated a plan wherein Bouldin would purchase the first ounce, while other officers conducted surveillance of Hedley in order to ascertain where he was getting the subsequent shipments of cocaine. Hedley was then to be arrested during a subsequent and larger delivery.

Between 1:30 and 2:00 P.M., Glanz, Bouldin, Patrolman Donald Anthony of the New Castle County Police Department and trooper Edward Stevens of the Delaware State Police met in a parking lot across the street from the Paper Mill Apartments. The officers were then informed that the vehicle targeted for surveillance was the red Peugot.

A little after 2:00 P.M., Bouldin went to Hedley's apartment to await Hedley's arrival. At about 2:15, the informant, who was

---

1. The inference from the record is that the informant shared an apartment with Hedley. Both Bouldin and Special Agent Glanz testified that this informant had given them reliable and accurate information on more than one previous occasion.

2. Delaware Tag No. 565487.

3. Delaware Tag No. PC307. Bouldin later found out that the VW was registered in the name of A. K. Mearns, Jr.

also in the apartment, received a phone call notifying him that Hedley would be arriving soon with the cocaine. Bouldin then radioed Glanz that Hedley was on his way. Shortly thereafter Hedley arrived at his apartment. Bouldin stayed in the informant's bedroom during the transaction. He did observe Hedley walking from his bedroom to the kitchen carrying a scale. At about 2:23 P.M. Bouldin received one ounce of cocaine from the informant, and gave the informant $1,100 which he observed the informant. hand to Hedley. Bouldin then asked Hedley how long a second delivery of seven ounces would take. Hedley told him that it would take a half hour from the time he left his apartment.

Bouldin exited Hedley's apartment and met with Anthony in the parking lot across the street. He field tested the cocaine and got a positive result. Bouldin told Anthony that Hedley was leaving shortly to get seven more ounces of cocaine. The rest of the surveillance team was notified of these occurrences.

At about 2:45 P.M. Hedley left his apartment and drove off in his Peugot. Bouldin then returned to Hedley's apartment where he remained for the rest of the afternoon. Glanz initially followed Hedley but soon returned to the parking lot of the Paper Mill Apartments. Anthony also followed Hedley. Hedley went directly to the Deer Park Tavern. Stevens also came to the Deer Park Tavern to aid in the surveillance effort after Anthony radioed him that the Peugot had arrived there. The VW was among the other vehicles parked in the Deer Park parking lot at that time. The surveillance team observed the Deer Park Tavern from a parking lot across the road. No surveillance was done inside the tavern. After 15 or 20 minutes, at about 3:10 P.M., Hedley left the tavern and drove off. As he drove away, two males, later identified as Mearns and Thomas, also left the Deer Park Tavern, and drove off in the VW.

Stevens followed Hedley from the Deer Park and Anthony followed Mearns and Thomas. Stevens subsequently lost contact with Hedley. Anthony followed the VW to the Victoria Mews Apartments, where Mearns and Thomas exited the vehicle. Surveillance was maintained only on the VW itself. At about 3:45, Mearns and Thomas returned to the VW and drove off. By this time, both Anthony the Stevens were following the VW.

At about 3:55 P.M., the VW entered the parking lot of the Stone Balloon, a bar in Newark. Shortly thereafter, the Peugot entered the lot and parked in close proximity to the VW. Anthony conducted surveillance on foot from a distance of about forty yards while Stevens remained in his car. None of the occupants of either vehicle left their vehicles at that time. No intercourse or exchange between the occupants of the two vehicles was observed.[4] After about five minutes, both vehicles exited from the Stone Balloon parking lot and drove to the Paper Mill Apartments. Hedley drove his Peugot to the vicinity of his apartment. The VW was parked 300 to 400 hundred feet away, with a partially obstructed view of the back of Hedley's apartment, where there were sliding glass doors.

After having telephoned Bouldin at about 3:55 P.M. to make sure he was still prepared to proceed with the transaction, Hedley returned to his apartment at about 4:07 P.M. and delivered seven ounces of cocaine in a non-dairy creamer jar to Bouldin who field tested it, getting a positive result. Bouldin then made a phone call (under the pretext of calling for the money to be delivered) to his Secretary at the DEA office, who radioed the surveillance team that the transaction had been completed and that the arrests should be made.

Glanz and Officer Dreher of the New Castle County Police Department entered Hedley's apartment, where Dreher arrested Hedley and read him his rights. When his rights had been read to him, Hedley blurted out something to the effect that he had only seven ounces. He made no further statements. Stevens, and his companion,

---

4. Anthony testified that due to his distance and the angles and window positioning of the vehi-

cles, he could not be sure that there was no exchange between the two vehicles.

Trooper Lake, then proceeded to arrest Mearns who was the only occupant of the VW at that time. Mearns was sitting with his back to the driver's side door and was reading a newspaper. Stevens reached through the driver's side window of the VW, put his arm around Mearns' neck and pointed his automatic pistol at him, while Lake pointed a shotgun at him from the passenger's side. Mearns was handcuffed and placed in Anthony's car. Stevens was unable to locate Thomas. Thomas was arrested a few minutes later by Anthony and his companion, Sergeant Krammes, when he was observed walking toward the VW.

When Mearns was first arrested, he was placed in Anthony's car. At that time, Anthony informally advised Mearns of his rights from memory and told him that he did not want a statement at that time. When Thomas was arrested, he was put into Anthony's car with Mearns. Anthony then formally advised both Mearns and Thomas of their constitutional rights.[5] Both Mearns and Thomas stated that they did not wish to make statements. Thomas requested a lawyer. There is a conflict in the testimony as to Mearns' request for an attorney. Mearns claims that after Thomas asked for a lawyer, he said: "me, too". However, Anthony has no recollection of such a statement by Mearns. Anthony testified that the only time he heard Mearns ask for an attorney was after he had been taken to the DEA office. (Tr. 55). Anthony also frisked Thomas and confiscated his wallet.

Despite Mearns' and Thomas' decisions not to make statements, they were separated in the hope that one of them would begin talking. Thomas remained with Anthony and Krammes and refused to make a statement despite repeated questioning by Anthony. Mearns was placed in Stevens' car with Stevens and Lake. Stevens had been told by Anthony that Mearns had been read his rights and had said that he didn't want to make a statement at that time. Stevens testified that Lake then informed Mearns of his rights again. Mearns did not recall this, and stated that only Anthony had told him he could have an attorney present at questioning. (Tr. 157). Stevens then began asking Mearns questions. Mearns testified that he told Stevens he didn't want to say anything. When Stevens persisted, Mearns eventually began to talk. Though he was hesitant, he did make some incriminating remarks about his role in the delivery of the cocaine. Mearns also referred to the possibility of getting his father's attorney at several points during the questioning. Stevens testified that although Mearns had mentioned the possibility of getting an attorney, Mearns never definitely stated his preference for an attorney to be present at questioning. Stevens testified that Mearns was clearly undecided as to whether to get an attorney. Stevens did state that "[Mearns] felt he should be represented, I'm sure" (Tr. 32), but not necessarily at the interrogation stage.

During the questioning, Mearns told Stevens that there was more cocaine in the VW. At one point, Glanz came to Stevens' car and asked Mearns if there was more cocaine in the VW. At first, Mearns did not respond, but when Glanz told him if there was any, they would get a search warrant and get it anyway, Mearns told him that there was more cocaine in a non-

---

5. Anthony read the following statement to Mearns and Thomas:

Number one, you have the right to remain silent.

Number two, anything you say can and will be used against you in a court of law.

Number three, you have the right to talk to a lawyer and have him present with you while you are being questioned.

Number four, if you cannot afford to hire a lawyer, one will be appointed to represent you, before any questioning, if you wish one.

Number five, if at any time during this interview, you wish to discontinue your statement, you have the right to do so.

He then read them the following waiver:

Do you understand each of these rights as I have explained them to you, and then having these rights in mind, do you wish to talk to us now?

(Tr. 83).

dairy creamer jar behind the seat. At some later point, Mearns definitely told Stevens he didn't want to say any more before he talked to a lawyer, but Stevens did continue to ask questions, though he got no "new" information. Mearns testified that "I knew I didn't have to make a statement", but said that he talked because he was frightened.

Glanz seized the van allegedly pursuant to 21 U.S.C. § 881. Glanz and Anthony, assisted by an Assistant United States Attorney, then dictated an affidavit for a search warrant for the van, including Mearns' statement that there was more cocaine in the van. A search warrant was issued based upon that affidavit. When the van was searched, seven ounces of cocaine were discovered. Hedley, Mearns and Thomas were taken to the DEA office in Wilmington and strip-searched.[6]

There are a series of issues here relating to the admissibility of certain statements and tangible evidence. The first question is whether the arrests of the defendants were supported by probable cause, and whether, therefore, the statements made after the arrests and the evidence confiscated in the searches pursuant to those arrests are admissible. The second question is whether the defendants were properly advised of their constitutional rights, if so, whether they attempted to invoke these rights, and ultimately whether any statements they made in response to the police interrogation are admissible. A corollary question is whether the search warrant, which was based in part upon Mearns' statement, was valid, and whether the items seized in the search are admissible.

## PROBABLE CAUSE FOR THE ARRESTS

### 1. *Hedley.*

■ Due to his transactions with Bouldin, there was probable cause for the arrest of Hedley.

### 2. *Mearns And Thomas*

■ Mearns and Thomas contend that their warrantless arrests were conducted without probable cause on the part of the officers, and, therefore, that any statements or other evidence which were taken from them fall within the scope of the exclusionary rule as fruits of an illegal arrest. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

There is a strong preference for arrests with warrants, and the government has the burden of proving the validity of a warrantless arrest. *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). In doing so, the government must show that its agents had knowledge and/or reliable information which would lead a reasonable man to believe that a crime had been committed by Mearns and Thomas. *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). *See also Henry v. United States,* 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). The law is clear that the government must have more than a suspicion based upon contact with a drug dealer or other known criminal in order to establish probable cause for an arrest. *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *United States v. DiRe,* 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948); *United States v. Gonzalez,* 362 F.Supp. 415 (S.D.N.Y.1973); *United States v. Bergdoll,* 412 F.Supp. 1323 (D.Del.1976), *aff'd. United States v. Byerly,* 556 F.2d 569 (3rd Cir. 1977), *cert. denied sub nom. Byerly v. United States,* —— U.S. ——, 98 S.Ct. 181, 54 L.Ed.2d 131 (1977). In this case, I find that the knowledge and information which the officers had at the time of the arrests of Mearns and Thomas were sufficient to establish probable cause.

For the reasons which follow, I believe that the officials had reason to conclude that the informant in this case was credible and his information reliable under the standard set out by the Supreme Court in such

---

**6.** There is nothing in the record to indicate what items were seized as a result of the strip search.

cases as *United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aquilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); and *Draper v. United States, supra.*

Bouldin and Glanz testified that the informant had been an informant on previous occasions and that his information had proved to be reliable at those times. (Tr. 97, 101, 103, 124). In addition, the first part of the information which the informant gave Bouldin was verified by observation, thus making it reasonable to conclude that the rest of the information was reliable. *Draper, supra.* It also seems clear from the record that the informant was sharing an apartment with Hedley, which would be an underlying circumstance enhancing his credibility. Finally, the informant was the intermediary in the initial one ounce transaction between Hedley and Bouldin. All of these circumstances indicate that the informant knew of what he spoke, and that the officers had a "substantial basis" for crediting his information. *Jones v. United States,* 362 U.S. 257, 272, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

Up until the time of the arrest, the law enforcement officials did not know the identities of Mearns or Thomas, other than that they were the occupants of the VW.[7] On September 25, 1977, the informant told Bouldin that Hedley would be leaving his residence, driving to the Wilmington train station where he would pick someone up, and later meet with his source of supply of cocaine in the parking lot of the Greenville Shopping Center. (Tr. 97). Bouldin set up surveillance and followed Hedley, who took the route the informant had suggested. At the Greenville Shopping Center, Bouldin observed Hedley enter the VW, from which, together with the informant's information, Bouldin could infer that the occupants of the VW were the source of supply.

On the morning of September 26, 1977, the informant told Bouldin that Hedley's source of supply of cocaine would be arriving at the Paper Mill Apartments shortly. (Tr. 100–101). At about 11:15 A.M., Bouldin observed the VW and its two white male occupants in the parking lot near Hedley's apartment.

On the afternoon of September 26, 1977, Hedley left his apartment and said he planned to return with seven more ounces of cocaine for Bouldin. It was a fair inference on Bouldin's part that Hedley was going to meet with his source of supply that afternoon. Hedley went to the Deer Park Tavern, where the VW was already parked, and where Mearns and Thomas exited immediately after Hedley had left. After a stop at the Victoria Mews Apartments, Mearns and Thomas parked in the Stone Balloon parking lot. Moments later, Hedley pulled in and parked next to the VW. While no communication or transfer was observed between the two vehicles or their occupants, the position of the vehicles and the points of surveillance were such that such a contact could have taken place without being observed. After a few moments, the two vehicles exited together and returned to the parking lot of the Paper Mill Apartments. Hedley then entered his apartment and offered Bouldin seven ounces of cocaine. Shortly thereafter, Mearns and Thomas were arrested.[8]

When the information from the reliable informant is considered together with the observations of the officers, I conclude that the police had probable cause to arrest Mearns and Thomas, the occupants of the VW. The information suggesting that the VW was the source of supply of the cocaine, and the inference that Hedley was going to meet with his source of supply, together with the observations at the Deer Park Tavern, the Stone Balloon and the Paper Mill Apartments (all within an hour) would

---

**7.** Bouldin did know that the VW was owned by A. K. Mearns, Jr.

**8.** Although Thomas was not in the VW at the time of his arrest, he was arrested by Anthony,

who had previously observed Thomas and was able to identify him as the second occupant of the VW. (Tr. 46, 56, 57).

lead a reasonable man to conclude that Mearns and Thomas were involved with Hedley in the sale of cocaine to Bouldin. Accordingly, the arrests were legal and will not be the cause of the suppression of any evidence.

### SELF–INCRIMINATION

#### 1. *Hedley.*

■ After Hedley had been advised of his constitutional rights by Dreher, he voluntarily blurted out a statement. Thereafter, he made no other remarks to the law enforcement officials. Under the standards set out in *Miranda v. Arizona,* 384 U.S. 426, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Hedley's statement is admissible.

#### 2. *Mearns.*

■ Mearns contends that under *Miranda v. Arizona, supra,* there are two grounds upon which any and all in-custody statements he made to law enforcement officials must be suppressed. First, he argues that since his statements were made after his invocation of his right to remain silent was disregarded, they must, therefore, be excluded under the Fifth Amendment. Second, he contends that since his statements were made after his request for counsel was made and ignored, those statements are inadmissible under *Miranda.* Whether Mearns did in fact invoke his right to have counsel present during his interrogation is not clearly established by the record. However, since I conclude that his first ground requires suppression, I do not find it necessary to resolve the factual question concerning the request for counsel.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any case to be a witness against himself". In dealing with the self-incrimination problem, *Miranda v. Arizona* set up guidelines controlling the admissibility of statements by persons interrogated while in the custody of law enforcement officials. The *Mi-*

*randa* court stated, at 384 U.S. at 473, 86 S.Ct. at 1627:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without *the right to cut off questioning,* the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. (Emphasis supplied)

In the instant case, when Anthony read him his *Miranda* rights, Mearns made the choice to exercise his right to remain silent and to cut off questioning and indicated this to Anthony. (Tr. 84, 85, 146). Under *Miranda,* at that point, the interrogation had to cease. Anthony did not continue to ask Mearns questions. However, Mearns was then separated from Thomas so that either one of them would feel free to make a statement, despite the fact that both had just invoked their right to remain silent. (Tr. 58, 66). Mearns was put into Stevens' car, where once again he was advised of his rights[9] and questioned by Stevens. Stevens knew that Anthony had already advised Mearns of his rights and that just moments earlier, Mearns had voiced a desire to remain silent. (Tr. 17, 85). After some prodding by Stevens, Mearns did make a number of incriminating statements. The question here, therefore, is whether after Mearns had once invoked his right of silence, statements made by him at a second interrogation a few moments later are admissible.

In *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the Supreme Court examined a situation where a

---

**9.** There is a dispute as to whether there was a second reading of the rights (Cf. Tr. 29 with 148, 157). However, for the present purposes,

I am willing to accept as true that Lake did read Mearns his rights.

person in police custody invoked his right to remain silent once and then was interrogated a second time after a second reading of the *Miranda* rights. Although *Mosley* is sufficiently dissimilar in its facts that its result is inapplicable here,[10] I find its analysis dispositive of this case.

*Mosley* begins by interpreting *Miranda.* The key concept in dealing with the resumption of interrogation, from the section of *Miranda* quoted above, is the individual's "right to cut off questioning". 384 U.S. at 473, 86 S.Ct. 1602. Though the *Mosley* court did not mandate any blanket prohibition against a resumption of questioning, it did indicate that if a person's right to cut off questioning is not "scrupulously honored", 423 U.S. at 104, 96 S.Ct. 321, then anything he says will be suppressible.

As the *Mosley* case indicates, not all statements or answers made by a person after he or she has once decided to exercise the right to cut off questioning are subject to suppression. The question in each case must be whether under all the circumstances it can be said that the resumption of questioning was consistent with scrupulous observance of the right to cut off questioning. Where the law enforcement officials terminate the questioning on request, for example, and thereafter resume questioning after a change in circumstances giving rise to an inference that the person in custody may then wish to speak for reasons unrelated to the conduct or strategy of his inquisitions, there is no conflict between the exercise of the right to remain silent and the resumption of questioning. Thus, the discovery of new facts, or a distinct charge of which the person may be suspected, or even the passage of a substantial period of time giving opportunity for reflection, may warrant a finding that there was no violation of the right to terminate interrogation. But the case before me is far different from any of these situations.

It is clear from the record that Mearns exercised his right to cut off questioning when he was initially advised of his right. It is equally clear that this decision was not scrupulously honored. Mearns was separated from Thomas in order that one or both might make a statement. Mearns was then taken into Stevens' custody within moments of his invocation of his right to remain silent. He was again advised of his rights, and again indicated that he did not want to make a statement.[11] Yet, Stevens persisted in questioning him until he did talk. The officers went far beyond a direct inquiry as to whether he had changed his mind about making a statement. In short, the police actions after Mearns' initial decision to remain silent, including the second interrogation, cannot be said to be a scrupulous honoring of the right to cut off questioning.

Indeed, in the context of these facts, to hold that the officers' conduct was consistent with the scrupulous honoring of his right to cut off questioning would be to remove any substance from that right. As Justice Stewart, writing for the majority in *Mosley*, stated:

> To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned.

*See also United States v. Clayton,* 407 F.Supp. 204 (E.D.Wis.1976).

Any and all statements which Mearns made to law enforcement officials after his initial decision to invoke his right to remain silent must be suppressed.

### 3. *Thomas.*

Thomas made no statements to the law enforcement officials.

---

**10.** In *Mosley,* the second interrogation occurred two hours after the first and concerned a different crime than the first. Under those circumstances, the court held that the second interrogation did not produce statements in violation of the defendant's Fifth Amendment privilege.

**11.** Mearns testified that he told Stevens he didn't want to say anything. (Tr. 146). Stevens testified that Mearns was hesitant and reluctant to talk. (Tr. 19, 32).

## THE SEARCH WARRANT

Mearns has also moved to suppress the cocaine found in his VW. He argues that his statement to Glanz to the effect that there was cocaine in his vehicle was illegally obtained, that the use of that declaration in Glanz's affidavit in support of the search warrant tainted the warrant, and that the evidence found in the search must be suppressed as "fruit of the poisonous tree", under the doctrine of *Wong Sun v. United States, supra.*

■ In *Wong Sun,* the defendant's statements were excluded as fruits of an unlawful entry and unauthorized arrest. The Supreme Court also excluded certain narcotics seized as a result of the illegally obtained declarations where the prosecutor conceded that the drugs wouldn't have been found without the illegal declaration. However, *Wong Sun* also pointed out that if there were an "independent source" from which the government learned of the evidence, the exclusionary rule would have no application. The inference from *Wong Sun* is that even if illegally obtained statements lead to the seizure of evidence, that evidence need not be suppressed if there is an independent source which would have led the police to that evidence anyway.

■ The Third Circuit has applied this principle in the context of tainted affidavits submitted in support of a search warrant application. *United States v. Sterling,* 369 F.2d 799 (3rd Cir. 1966). When such an affidavit contains unlawfully obtained information, the validity of the warrant and the search depends upon whether the untainted information was sufficient to establish probable cause. As Judge Seitz said in *Sterling,* at 369 F.2d at 802:

. . . the law is quite clear that the inclusion of illegally obtained evidence does not vitiate a search warrant which is otherwise validly issued upon probable cause reflected in the affidavit and based on proper sources.

*See also James v. United States,* 135 U.S. App.D.C. 314, 418 F.2d 1150, 1151 (1969); *United States v. Watts,* 176 U.S.App.D.C. 314, 540 F.2d 1093, 1095, n. 2 (1976).

■ Since all the information in the affidavit in this case except Mearns' statement itself had a source independent of Mearns' interrogation, the proper inquiry is whether the Glanz affidavit, absent the Mearns' statement (Paragraph 7), established probable cause for the issuance of a valid warrant, i. e., whether the affidavit established probable cause to believe there was cocaine in the VW. It is, therefore, necessary to examine that affidavit carefully. In making this examination it must be kept in mind that search warrant affidavits are to be read in a common sense, rather than technical, manner. *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

■ Deleting Paragraph 7, Glanz stated that Bouldin had purchased an ounce of cocaine from Hedley, that Hedley had told Bouldin that he was going to meet with his source of supply and return shortly with seven more ounces,[12] that Hedley's activities were under surveillance, that Hedley went to the Deer Park Tavern, where he exited with two white males who drove off in the VW,[13] that Hedley parked in the Stone Balloon parking lot while the VW was parked there, that the VW went to the Paper Mill Apartments where it parked with a view of Hedley's apartment,[14] that Hedley returned to his apartment and of-

12. The record developed at the suppression hearing indicates that Hedley only told Bouldin he would return with the cocaine, and not that he was going to meet with his source of supply. However, under the circumstances, I think it fair to infer that Hedley was going to meet with his source of supply.

13. The record indicated that Hedley did not leave the Deer Park Tavern with Mearns and Thomas, but rather that they left after Hedley

had exited and as he was driving away. I do not believe that this difference will be crucial in the disposition of this motion.

14. Although the affidavit said that the VW was parked with a view of the front door of Hedley's apartment, the record indicates that there was actually a view of the sliding doors to the patio.

fered Bouldin seven ounces of cocaine, and that Hedley had told Bouldin that he would be able to sell him seven more ounces as soon as that sale was consummated.

The crucial facts which would give the law enforcement officers probable cause to believe that there was cocaine in the VW, of course, are those linking Hedley's activities with those of the VW and its occupants. I find that even without Paragraph 7 the facts set out by Glanz in his affidavit established probable cause to conclude that there was cocaine in the VW. Given the facts that Bouldin had reasonably inferred from Hedley's remarks that Hedley was going to meet with his source of supply of cocaine, that Hedley was then seen in the proximity of the VW three times within the next hour, that Hedley had informed Bouldin that there would be another cocaine transaction to follow as soon as that one was consummated and that the VW van was parked within signalling range when the sale of the seven ounces took place, I conclude that the Glanz affidavit, without Paragraph 7, provided probable cause to believe that more cocaine would be found in the VW. It follows that the search warrant was valid, that the search was legal, and that the evidence seized will not be suppressed.

### MOTION TO INSPECT GRAND JURY MINUTES

 Mearns has moved the Court to allow him to inspect the grand jury minutes of the proceedings leading to his indictment. Rule 6(e) of the Federal Rules of Criminal Procedure, effective October 1, 1977, provides that grand jury proceedings are generally secret. However, Rule 6(e)(2)(C) provides that disclosure may be made:

(i) when so directed by a court preliminary to or in connection with a judicial proceeding; or

(ii) when permitted by a court at the request of the defendant, upon a showing

that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury.

These subsections have not been materially changed by the amendments to Rule 6.

Pursuant to the Rule, the burden is on the defendant to show a "particularized need" in order to be allowed to inspect the grand jury minutes. *Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959), *rehearing denied* 361 U.S. 855, 80 S.Ct. 42, 4 L.Ed.2d 94 (1959); *United States v. Winchester,* 407 F.Supp. 261 (D.Del.1975). Here, Mearns has made no such showing. He has stated that those minutes are likely to disclose inconsistent testimony of a law enforcement officer, and that the credibility of the officers has been sufficiently impeached so as to warrant the production of grand jury minutes. Without a more specific showing, those minutes will not be produced at the present time. Should a particularized need develop at some future time, Mearns' application may be renewed. The motion will be denied.

### MOTION FOR A SEPARATE TRIAL

Thomas has moved for a separate trial under Rule 14 of the Federal Rules of Criminal Procedure. There are three separate grounds for this motion. First, it is claimed that a severance is necessary due to statements by Mearns to the police which implicate Thomas. Second, he claims that a severance is warranted because the defenses of the three co-defendants are antagonistic. Finally, Thomas seeks a separate trial because the evidence against him is so much less than that available against his co-defendants.

 Thomas' first argument is based upon the holding of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Under that holding, if the statement from Mearns to the police implicating Thomas were admissible and Mearns failed to take the stand, Thomas

would be deprived of his right to confrontation under the Sixth Amendment. However, since I have already held that all of Mearns' statements to the police must be suppressed, the *Bruton* problem does not exist.[15]

▮ Thomas' next claim, that severance is warranted due to the antagonistic defenses of the co-defendants, lacks merit. As the Third Circuit stated in *United States v. Barber,* 442 F.2d 517, 530 (3rd Cir. 1971), *cert. denied, Mowbray v. United States,* 404 U.S. 846, 92 S.Ct. 148, 30 L.Ed.2d 83 (1971):

> . . . the mere presence of hostility among defendants or the desire of one to exculpate himself by inculpating another have both been held to be insufficient grounds to require separate trials.

Unless a defendant can make a showing that the antagonistic defenses are so prejudicial that the jury will unjustly infer from the conflict itself that both defendants are guilty, no severance is warranted. *United States v. Caldwell,* 178 U.S.App.D.C. 20, 543 F.2d 1333 (1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). Since Thomas has made no such showing, severance will not be granted on this ground.

▮ Thomas' final claim is that he deserves a separate trial as a result of the disproportionate amount of evidence available against the other two defendants as compared to him. This argument is also without merit. In *United States v. DeLarosa,* 450 F.2d 1057, 1065 (3rd Cir. 1971),

*cert. denied, Bashen v. United States,* 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 800 (1972), the court stated:

> A defendant is not entitled to a severance merely because the evidence against a co-defendant is more damaging than the evidence against him. . . . While such a disparity in the proofs is sufficient in certain cases, the primary consideration is whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants in view of its volume and limited admissibility. (Citations omitted)

*See also United States v. Dansker,* 537 F.2d 40 (3rd Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1976). In this case, the facts do not appear, at this stage, to be so complex, voluminous or confusing that a jury cannot reasonably be expected to compartmentalize the evidence as it relates to each defendant.

Thomas' motion for a separate trial is denied.

---

**15.** Under *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) and *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), if Mearns testifies at trial, in the event of any conflict, his statements may be used to impeach his credibility on cross-examination. If this situation should arise, however, any prejudice to Thomas can be cured by means short of separate trials, such as expurgating Thomas' name from any statements used for this purpose.