THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LARRY WADE COLLEY, Defendant-Appellant.

First District (1st Division)    No. 78-1637

Opinion filed April 14, 1980.

James J. Doherty, Public Defender, of Chicago (Michael McInerney and Ira Churgin, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Iris E. Sholder, and Gerald E. Nora, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Larry Wade Colley, was charged with the offense of murder. Following a jury trial, he was convicted and sentenced to 14 to 16 years imprisonment. On appeal, defendant contends: (1) he was not proved guilty beyond a reasonable doubt, and (2) the trial court erred by not suppressing his post-arrest statements.

The following pertinent evidence was adduced by the State at trial:

Gilbert Nehmsow testified that he and defendant spent the evening of May 27, 1976, at the Los Hombres motorcycle "club" near Gary, Indiana. Defendant carried a .38-caliber Colt revolver the entire night. Both men drank beer and talked at the club. At about midnight, they left and arrived at Nehmsow's apartment on the southeast side of Chicago at about 1 a.m. There, they drank beer until around 3 a.m., when they decided to go out and purchase more beer. Defendant and Nehmsow were unable to find an open tavern or liquor store. They also unsuccessfully attempted to awaken a friend in a nearby residence.

According to Nehmsow, during the return trip to his apartment they reached the intersection of 100th and Commercial and stopped at the stop sign. Located on the southeast corner of the intersection was a tavern named Caesar's Palace. The time was about 4:30 a.m., the bar was closed to patrons at 4 a.m., and the outside lights were off.

However, six people were inside the tavern. The owner, Radivoja Novovic, was cleaning the tavern with the help of his brother Drago and an employee named Radomir Radvonovich. Mr. Novovic's wife, Mira Novovic, was standing behind the bar closing out the cash register. Drago's girlfriend sat on a stage waiting for the men to finish cleaning. Mr. Novovic's friend, Mike Gallich, was just returning from a rear washroom.

The front door of the tavern was partially open. Inside the tavern, all the lights were turned on for cleaning, including three or four spotlights in each corner, three lights over the bar, and a large light behind the bar. The bar was located directly behind the front door. Light from inside the tavern emanated from the partially opened front door.

Nehmsow testified that as he drove past Caesar's Palace, defendant took out his revolver, held it in both hands outside the passenger window and began firing at the tavern. Defendant fired five or six shots at the front door of the tavern. When Nehmsow shouted, "What the hell are you doing?", defendant replied, "Fuck those people."

Several people inside the tavern saw wood splintered from the front door. One of the bullets fired by defendant struck Mira Novovic, causing her death. Outside, Nehmsow and defendant drove off down 100th Street. When defendant got out of the car, he warned Nehmsow not to tell anyone what occurred.

Police ballistics tests revealed that the weapon recovered from

defendant was the same weapon used to shoot and kill Mira Novovic. Four bullets recovered from the premises and the bullet found in decedent's body had been fired from defendant's gun. The bullets used were hollow-point, high-velocity bullets. According to the manufacturer, they were to be used only for law enforcement.

Dr. Eupil Choi conducted an autopsy on decedent. He determined that a bullet had entered the body through the outer side of the left arm. The bullet traversed the body piercing the left upper lung and puncturing the aorta and right upper lung. The bullet stopped only one centimeter from the surface of the right armpit. That bullet had a wooden fragment imbedded in its tip.

Nehmsow explained that he and defendant were familiar with Caesar's Palace. Nehmsow stopped in there every couple of weeks. Several weeks before the shooting, he had been there with defendant when a fight occurred. Several persons had been forced to leave, but Nehmsow was not sure whether defendant had to leave the tavern.

Officer Peter Dignan testified that he and his partner, Officer John Solecki, were present when defendant made certain post-arrest statements. In an oral statement, defendant indicated that he shot through the tavern door because he had been hassled there. He used 140 gram, spiro jacket, hollow-point bullets. In a subsequent written statement, defendant substantially corroborated his oral statement with two additions. Defendant stated he fired the shots because he was drunk and because he had been jumped in the tavern.

Defendant testified in his own behalf. He bought a Colt Detective Special .38-caliber revolver on May 15, 1976. On May 27, 1976, he went with Nehmsow to the Los Hombres Motorcycle Club. They stayed there about five hours. According to defendant, he consumed close to one case (24 cans) of beer and one-half pint of whiskey and became intoxicated. Defendant substantially corroborated Nehmsow's testimony concerning their return to Chicago and search for more beer. According to defendant, Nehmsow also carried a gun. When they were stopped at 100th and Commercial, Nehmsow said, "Hey, when I take off shoot—shoot a hole in the door at Caesar's Palace." Defendant looked around and didn't see anybody and said, "Okay. Go ahead." He fired a shot and started to jerk his arm back in. Nehmsow urged the defendant to "go ahead" and keep firing. Defendant then fired the five remaining shells.

Defendant denied saying, "Fuck those people" as he was firing his gun. He did not remember seeing light coming from the interior of the tavern and claimed the front door was closed. He admitted being a patron at Caesar's Palace, but denied ever being hassled there. Defendant admitted that during his post-arrest statements to the police he stated that he fired the shots because he had been hassled in the tavern. He explained

that he said that because he was tired and hoped an explanation for the shooting would end police questioning. Defendant denied that he had known anyone was in the tavern or that he intended to kill anyone within.

## I.

The jury found defendant guilty of the murder of Mira Novovic. He appeals, contending he was not proved guilty beyond a reasonable doubt. Specifically, he asserts that the State failed to prove he acted with the requisite mental state for the offense of murder.

In order for defendant to be guilty of murder, one of two requisite mental states had to exist when defendant fired his revolver at the door of Caesar's Palace. Either defendant intended to kill or do great bodily harm or he knew that the act created a strong probability of death or great bodily harm. (Ill. Rev. Stat. 1975, ch. 38, pars. 9—1(a)(1), 9—1(a)(2); *People v. Carlton* (1975), 26 Ill. App. 3d 995, 326 N.E.2d 100; *People v. French* (1972), 3 Ill. App. 3d 884, 279 N.E.2d 519.) We believe that the latter mental state had been established by the evidence beyond a reasonable doubt because: (1) defendant knew the tavern was occupied and (2) defendant knew the destructive power of his weaponry.

There was overwhelming evidence indicating that the tavern was occupied. It was 4:30 a.m., the tavern was closed to patrons and the outside lights were off. However, all the inside lights were on in order to illuminate the tavern for cleaning. These lights included three lights over the bar, three or four spotlights in each corner of the tavern, and a large light behind the bar. The front door was partially open. Nehmsow testified that he could see light emanating through the open doorway as he drove by the tavern. Defendant did not decisively testify whether he did not see lights on in the tavern or whether he simply did not remember seeing lights on.

Moreover, defendant admitted that he was a patron of Caesar's Palace. The jury may have inferred defendant was familiar with the tavern's 4 a.m. closing time and knew people would be cleaning up inside at 4:30 a.m. According to Nehmsow, defendant aimed his gun at the wooden door and said, "Fuck those people" as he fired. This evidence, if believed, indicates defendant knew the tavern was occupied.

It is also uncontroverted that the defendant understood the destructive capabilities of his weaponry. Defendant was a gun expert, who had been shooting guns since his youth. He had received gun training in the Marine Corps and had educated himself concerning the Colt Detective Special .38-caliber revolver used in the killing. Defendant also knew that his gun was loaded with high velocity ammunition designed only for law enforcement. Yet defendant strafed the tavern with six of these bullets. One of these bullets pierced the wooden front door of the

tavern, entered Mira Novovic's left upper arm and then tore laterally through her entire chest cavity, stopping only one centimeter from the skin surface of her right armpit.

In short, defendant aimed and fired six shots at a simple wooden door—the only part of the tavern revealing signs of human occupancy, and the flimsiest barrier the tavern presented. Defendant fully understood the destructive impact of his weaponry. He knew that his actions created a strong probability of death or great bodily harm for the tavern's occupants.

Defendant asserts that, at most, his conduct constitutes involuntary manslaughter, *i.e.*, "a gross deviation from the standard of care which a reasonable person would exercise in that situation." (Ill. Rev. Stat. 1975, ch. 38, pars. 4—6, 9—3.) He relies on *People v. Felton* (1973), 12 Ill. App. 3d 201, 298 N.E.2d 372 (abstract). In *Felton*, defendant attempted to scare her boyfriend from coming after her by firing one shot from a .25-caliber revolver into his apartment door. She knew he was alone somewhere in the apartment. This shot hit and killed her boyfriend. The appellate court reduced defendant's conviction from murder to involuntary manslaughter because the evidence only showed defendant acted recklessly. Felton's single warning shot into an apartment door is distinguishable, however, from the instant case, where an experienced gunman took a high-caliber revolver loaded with high-velocity ammunition and strafed an occupied tavern with six shots. The mere fact that both defendants shot through a door does not mean that they shared similar mental states.

An individual's mental state may be inferred from the surrounding circumstances, including his actions. (*People v. Varnell* (1977), 54 Ill. App. 3d 824, 370 N.E.2d 145.) Unless inferences accepted by the jury are inherently impossible or unreasonable, a reviewing court will not substitute its judgment. (*People v. Trump* (1978), 62 Ill. App. 3d 747, 379 N.E.2d 370.) When, as here, the evidence is merely conflicting as to whether to impose a murder or manslaughter conviction, a reviewing court will not overturn the jury's determination. (*People v. Davis* (1966), 35 Ill. 2d 55, 219 N.E.2d 468.) Applying these principles to the circumstances of this case, we find the jury's determination as to defendant's mental state was amply supported by the evidence.

## MOTION TO SUPPRESS
### II.

Defendant also contends that the trial court erred by not suppressing his post-arrest statements. The following facts were adduced at the suppression hearing: During the evening of July 16, 1976, Officer John Solecki picked up Gilbert Nehmsow for questioning regarding the

shooting of Mira Novovic. At headquarters, in the presence of Solecki and his partner, Officer Peter Dignan, Nehmsow gave a statement. At about 4:15 a.m. on May 28, he was in his car with his friend, the defendant. Near 100th and Commercial, defendant produced a revolver and fired five or six shots at the door of Caesar's Palace Tavern. At about 1:30 a.m. on July 17, 1976, Solecki and Dignan arrested defendant. Solecki informed defendant he was under arrest for murder and advised him of his *Miranda* rights. When asked if he wanted to make a statement, defendant replied, "I have nothing to say."

The police then transported defendant to headquarters, arriving at about 2 a.m. Thereupon, defendant was taken to an interrogation room and handcuffed. Solecki again informed defendant of his *Miranda* rights. Defendant was apprised of the specifics of the alleged offense, when and where it occurred, and the identity of the deceased. Defendant was also informed that Gilbert Nehmsow had given a statement and was told the contents of that statement. At this point, approximately 2:10 or 2:15 a.m., defendant was asked if he would make a statement. He replied affirmatively.

Assistant State's Attorney Kevin Sweeney was called into the room. He identified himself and explained to defendant that he was not his attorney. He also read defendant his *Miranda* rights. Defendant indicated that he understood each right and opted to waive them. At about 2:15 a.m., defendant made an oral statement. At the end of this oral statement, Sweeney asked defendant if he would give a statement to be transcribed by a court reporter. Defendant agreed to provide a written statement. Because of the delay in the arrival of a court reporter, defendant did not give his written statement until 4:17 a.m. Sweeney once again read defendant his rights and determined that defendant understood and waived his rights before his statement.

At the conclusion of the hearing, the trial court denied defendant's motion to suppress, finding that defendant's statements were voluntary and that the State committed no *Miranda* violation.

On appeal, defendant contends that his statements should have been suppressed because they were taken after defendant had initially expressed his desire to remain silent. The State asserts that the defendant made the statements voluntarily after the police scrupulously honored his right to remain silent.

The principles set forth in *Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321, are central to our resolution of this issue. In *Mosley*, defendant was arrested for robbery and transported to the police station. There, he was given *Miranda* warnings and questioned. When defendant invoked his right of silence, interrogation stopped. Two hours later, another officer questioned defendant about a separate robbery-

murder and deceived defendant into making an inculpatory statement about the murder. The trial court allowed the statement into evidence and defendant was convicted of murder. Ultimately, the Supreme Court affirmed the conviction.

The *Mosley* court dealt almost entirely with the interpretation of a single passage of *Miranda v. Arizona* (1966), 384 U.S. 436, 473-74, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1628:

> "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise."

Interpreting the passage literally, said the court, "would lead to absurd and unintended results." (423 U.S. 96, 102, 46 L. Ed. 2d 313, 320, 96 S. Ct. 321, 326.) On the one hand, to allow continued interrogation after a momentary cessation would frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the suspect's will. At the other extreme, a "blanket prohibition" from further interrogation, regardless of circumstances, would unduly impede police investigatory activity. The court concluded "that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " 423 U.S. 96, 104, 46 L. Ed. 2d 313, 321, 96 S. Ct. 321, 326.

The *Mosley* court emphasized three circumstances which indicated that defendant's right to silence was scrupulously honored: (1) the passage of a significant time between questioning (there, two hours); (2) provision of a fresh set of *Miranda* warnings; and (3) renewed questioning by a different officer, involving a completely different offense.

In the instant case, defendant expressly invoked his right to remain silent upon arrest. Nonetheless, within 40-45 minutes both the police and Assistant State's Attorney Sweeney questioned defendant to determine if he would waive the right to silence he had so recently invoked.

■■ Initially, we note that it was proper police procedure to apprise defendant of the charges against him and of Nehmsow's statement. It is not a *Miranda* violation to reveal incriminating evidence against a defendant. (*People v. McKinley* (1977), 69 Ill. 2d 145, 370 N.E.2d 1040, *cert. denied* (1978), 435 U.S. 975, 56 L. Ed. 2d 69, 98 S. Ct. 1623.) If defendant had volunteered to speak without questioning upon being apprised of this information, his statement clearly would be admissible.

■ Moreover, "[t]he fact that a defendant has exercised his right to remain silent by declining a request that he make a statement does not permanently preclude all future inquiries by officers to determine whether he has changed his mind. [Citations.]" (*People v. Gibson* (1977), 55 Ill. App. 3d 929, 935, 371 N.E.2d 341.) There is a clear distinction between the continuation of "interrogation" and a subsequent request upon fresh *Miranda* warnings, for reconsideration of an earlier decision to make no statement. (*People v. Brookshaw* (1973), 12 Ill. App. 3d 221, 224, 299 N.E.2d 20. Accord, *United States v. Mearns* (D. Del. 1978), 443 F. Supp. 1244, 1253.) In our view, police efforts to determine whether a suspect has changed his mind are not as offensive as repeated and persistent efforts to wear down his resistance and cause him to change his mind. See *Mosley*, 423 U.S. 96, 105-06, 46 L. Ed. 2d 313, 322, 96 S. Ct. 321, 327; *People v. Pittman* (1973), 55 Ill. 2d 39, 302 N.E.2d 7.

Nonetheless, the efforts of the police and Sweeney do constitute questioning, and there is merit to defendant's position that a 40-45 minute delay in questioning does not represent the significant passage of time envisioned by *Mosley*. (See *United States v. Mearns* (D. Del. 1978), 443 F. Supp. 1244; *United States v. Clayton* (E. D. Wis. 1976), 407 F. Supp. 204.) A significant passage of time between questioning enables the suspect to have an opportunity to make an informed and intelligent assessment of his interests. *Michigan v. Mosley.*

It is not necessary, however, that we resolve the issue of the 40-45 minute delay and the admissibility of defendant's resultant oral inculpatory statement. Assuming, *arguendo*, that his oral statements should have been suppressed, we find that defendant's subsequent written statement was admissible.

■ The fact that an earlier statement is inadmissible does not necessarily make a subsequent statement which has been voluntarily reduced to writing inadmissible. (*People v. Roberson* (1977), 46 Ill. App. 3d 750, 361 N.E.2d 116; see also *People v. Brownell* (1980), 79 Ill. 2d 508, 404 N.E.2d 181.) Where defendant received fresh warnings and a significant period of time elapsed since illegal questioning (affording him the opportunity to reconsider his decision not to talk to the officers), defendant's responses may be voluntary and not tainted by the illegal questioning. (*United States v. Thevis* (D. Conn. 1979), 469 F. Supp. 490; *United States v. Lewis* (D. Conn. 1977), 425 F. Supp. 1166.) The court must measure the voluntariness of the later statement considering the totality of the circumstances, including the fact that defendant has been subjected to illegal questioning. *Tanner v. Vincent* (2d Cir. 1976), 541 F.2d 932, 936-37, *cert. denied* (1977), 429 U.S. 1065, 50 L. Ed. 2d 782, 97 S. Ct. 794.

■ In the instant case, defendant provided a written statement at 4:17 a.m., two hours after his oral statement and about three hours after his

only invocation of his fifth amendment privilege. Moreover, defendant was again advised of the *Miranda* warnings before his written statement, stated that he understood the warnings and voluntarily waived his privilege. We find that defendant had sufficient time to reassess his decision to remain silent. Decisional law supports this conclusion. See, *e.g., Mosley* (two-hour gap sufficient); *People v. Perez* (1979), 72 Ill. App. 3d 790, 391 N.E.2d 456; and *People v. Lakes* (1978), 60 Ill. App. 3d 271, 376 N.E.2d 730 (three-hour gap sufficient).

Furthermore, with respect to the written statement, *Mosley's* requirement that officers scrupulously honor defendant's right to silence was also met. Defendant received fresh warnings and knowingly and intelligently waived his rights. There was a significant delay in questioning. Although defendant was questioned about the same offense, this factor has not been deemed pivotal. (See *People v. Lakes* (1978), 60 Ill. App. 3d 271, 376 N.E.2d 730; *People v. Eason* (1976), 44 Ill. App. 3d 308, 357 N.E.2d 1191.) Since defendant's written statement substantially corroborated his earlier oral statement, any error in the admission of that first statement is harmless.

Even assuming the trial court erred in admitting defendant's written statement, there are circumstances where failure to comply with *Miranda* can be harmless. (*People v. Landgham* (1970), 122 Ill. App. 2d 9, 24, 257 N.E.2d 484, *cert. denied* (1971), 402 U.S. 911, 28 L. Ed. 2d 652, 91 S. Ct. 1389.) Constitutional errors can be regarded as harmless if beyond a reasonable doubt the error did not contribute to the finding of guilt. (*Chapman v. California* (1967), 386 U.S. 18, 18 L. Ed. 2d 241, 87 S. Ct. 1283; *People v. Smith* (1967), 38 Ill. 2d 13, 230 N.E.2d 188.) Error does not contribute to the finding of guilt where the alleged erroneously admitted evidence did not prove an element of the crime not established by other properly admitted evidence. *Landgham.*

Although defendant contended he was not proved guilty of the offense of murder beyond a reasonable doubt, he only contested the evidence concerning his mental state at the time of the offense. Defendant conceded the act of firing the fatal shots. The testimony of the defendant and Nehmsow and the physical evidence establish the elements of the offense apart from defendant's post-arrest statements. We believe the evidence of guilt was overwhelming and that any error was harmless.

For the aforementioned reasons the judgment of the circuit court of Cook County is affirmed.

Affirmed.

GOLDBERG, P. J., and CAMPBELL, J., concur.